[Cite as *Horvath v. Lawyers Title Ins. Corp.*, 2013-Ohio-1295.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| SANDRA A. HORVATH, EXECUTOR OF THE ESTATE OF HELEN T. LUKAS, et al., | : | **O P I N I O N** |
| | : | |
| Plaintiffs-Appellants, | : | **CASE NO. 2012-P-0068** |
| | : | |
| - vs - | : | |
| LAWYERS TITLE INSURANCE CORPORATION, | : | |
| Defendant, | : | |
| FIDELITY NATIONAL TITLE INSURANCE CO., et al., | : | |
| | : | |
| Defendant-Appellee. | | |

Civil Appeal from the Court of Common Pleas, Case No. 2010 CV 01168.

Judgment: Affirmed.

*Edward D. Hayman*, 28499 Orange Meadow Lane, Orange Village, OH 44022 (For Plaintiffs-Appellants).

*Mark F. Craig*, Brouse McDowell, 36901 American Way, Suite 2-B, Avon, OH 44011 (For Defendant-Appellee).

TIMOTHY P. CANNON, P.J.

{¶1} Sandra A. Horvath, individually and as executor of the estate of Helen T. Lukas ("the Estate"), and other purported assignees of the Estate's claims (collectively referred to as "appellants"), appeal the judgment of the Portage County Court of Common Pleas granting appellee, Fidelity National Title Insurance Company's, motion

for summary judgment and denying appellants' motion for partial summary judgment. At issue is whether the trial court erred in entering summary judgment for appellee on appellants' tort claim of breach of duty of good faith dealing of an insurance company, and on their claim seeking damages for the criminal acts of the company's agent. For the reasons that follow, the judgment is affirmed.

{¶2} Helen T. Lukas owned real property located in Mantua, Ohio. Upon her death, the Estate entered into a contract to sell the property to William Stiles. Portage Title Agency, Inc. ("Portage Title") was to perform the insurance and escrow services. The real property transferred on November 24, 2009. Upon closing, Sandra Horvath, Ms. Lukas's daughter and executor of the Estate, received a check from Portage Title in the amount of $98,166.86, the net proceeds from the sale. The check was deposited in the Estate account and was returned due to insufficient funds. Portage Title abruptly ended operations on November 25, 2009.

{¶3} Portage Title was a party to an agency agreement with Lawyers Title Insurance Corporation ("Lawyers Title"), which was subsequently acquired by appellee, Fidelity National Title Insurance Company ("Fidelity"). Fidelity retroactively ended its agency relationship effective November 25, 2009, via letter to Portage Title dated December 17, 2009.

{¶4} Ms. Horvath made efforts to obtain the proceeds of the sale from Fidelity. In July 2010, Ms. Horvath, individually and as executor of the Estate, filed a complaint against multiple defendants, including Portage Title, Lawyers Title, and Fidelity. Joining Ms. Horvath as plaintiffs were her siblings, who were purported assignees of the Estate's claims: Gail Blair, Holly A. Kodash, James R. Lukas, and Daniel Lukas.

2

{¶5} The procedural posture of this case is somewhat tortured. Soon after the lawsuit was initiated, Fidelity tendered $98,166.86, the net proceeds from the sale. This amount was apparently tendered without any stipulations or releases from liability. As a result of this tender, Fidelity moved for summary judgment on Count Two of the original complaint, which alleged that Fidelity should have afforded closing protection coverage, and as a result, appellants sustained damages in the amount of $98,166.86. The trial court, on July 27, 2011, granted this partial summary judgment.

{¶6} Thereafter, appellants successfully sought leave to amend their initial complaint on two separate occasions. The second amended complaint, filed after Fidelity tendered the net proceeds from the sale, is specifically relevant to this appeal. In Count Two, appellants alleged that Fidelity breached its duty of good faith dealing by ignoring and avoiding Ms. Horvath's pursuit of the claim for the sale proceeds, even though Fidelity had actual knowledge of issues surrounding Portage Title's escrow account and actual knowledge that Ms. Horvath had not been offered closing protection coverage, in violation of state law. In Count Three, appellants alleged that Fidelity negligently selected, supervised, trained or retained its agent, Portage Title. As to damages for Count Two and Count Three, appellants sought "sums in excess of $1,000,000.00 as compensatory and punitive damages" for harm caused by the delay in payment, the loss of use of the money, and emotional and mental pain and suffering.

{¶7} With regard to this second amended complaint, appellants filed a motion for partial summary judgment, alleging they were entitled to judgment against Fidelity. Appellants assert there was no genuine issue of material fact regarding liability due to Fidelity's refusal to honor appellants' "claim," prior to tendering the sum of $98,166.86 (representing the proceeds of sale), coupled with Fidelity's actual knowledge of Portage

3

Title's questionable operations. Fidelity filed its own motion for summary judgment, alleging there was no basis for any cause of action against them. Fidelity advanced numerous arguments before the trial court, including the information contained in its cross motion for summary judgment, its supplemental brief in support of summary judgment, and its motion to dismiss the amended complaint, which the trial court converted into a summary judgment motion.

{¶8} In its judgment entry granting Fidelity's motion for summary judgment, the trial court laid out the five grounds Fidelity advanced before the court: (1) appellants' claims are barred under the economic loss doctrine due to lack of privity, i.e., the claims for economic loss under tort law are not legally cognizable without any contractual agreement; (2) appellants' tort claim for breach of fiduciary duty is barred because no claim was submitted to Fidelity and the estate was not an insured of Fidelity; (3) there is no evidence Fidelity acted in bad faith; (4) appellants have not established damages; and (5) appellants are not entitled to punitive damages without compensatory damages. Fidelity also argued that the assignment to the beneficiaries of the estate was invalid, though this argument is not referenced in the trial court's entry.

{¶9} The trial court granted Fidelity's motion for summary judgment, though it did not specify on which grounds it relied for its ruling. In addition, the trial court denied appellants' partial motion for summary judgment. The trial court subsequently deemed its entry a final order, pursuant to Civ.R. 54(B), certifying no just reason for delay. As summary judgment was entered exclusively in favor of Fidelity, it is the only relevant defendant for purposes of this appeal.

{¶10} Appellants timely appeal and assert two assignments of error, which state:

{¶11} [1.] The trial court committed error when it granted Summary Judgment to Defendant-Appellee, and denied Summary Judgment for Plaintiffs-Appellants, on Count Two, wherein it was alleged that Defendant-Appellee breached its duty of good faith dealing by an insurance company.

{¶12} [2.] The trial court committed error when it granted Summary Judgment to Defendant-Appellee, and denied Summary Judgment for Plaintiffs-Appellants, on Count Three, wherein it was alleged that Defendant-Appellee was liable as a Principal for the criminal acts of its Agent, Portage Title.

{¶13} We will first evaluate the trial court's granting of defendant's motion for summary judgment, as it is dispositive of appellants' contentions.

{¶14} Pursuant to Civil Rule 56(C), summary judgment is proper if:

{¶15} (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

{¶16} To prevail on a motion for summary judgment, the moving party has the initial burden to affirmatively demonstrate that there is no genuine issue of material fact to be resolved in the case, relying on evidence in the record pursuant to Civ.R. 56(C). *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996).

{¶17} As explained in *Dresher*:

{¶18} That is, the moving party bears the initial burden of *demonstrating* that there are no genuine issues of material fact concerning an essential element of the opponent's case. To accomplish this, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. The evidentiary materials listed in Civ.R. 56(C) include 'the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any.' These evidentiary materials must show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. (Emphasis sic.) *Dresher*, *supra*, at 292-293.

{¶19} If this initial burden is met, the nonmoving party then bears the reciprocal burden to set forth specific facts which prove there remains a genuine issue to be litigated, pursuant to Civ.R. 56(E). *Id.*

{¶20} An appellate court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Thus, the court of appeals applies "the same standard as the trial court, viewing the facts in the case in a light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party." *Viock v. Stowe-Woodward Co.*, 13 Ohio App.3d 7, 12 (6th Dist.1983).

{¶21} On Count Two of their complaint, appellants alleged a tort claim of breach of duty of good faith by Fidelity. Essentially, appellants contend Fidelity's refusal to tender the proceeds or, as alleged, honor Ms. Horvath's claim between the time the

6

Portage Title check was dishonored and the Fidelity check was tendered (approximately ten months) constituted bad faith. This was primarily due to Fidelity's knowledge of Portage Title's questionable dealings and the fact that they alleged Ms. Horvath was an insured in that she had closing protection coverage "by operation of law."

{¶22} It is well established that "based upon the relationship between an insurer and its insured, an insurer has the duty to act in good faith in the handling and payment of the claims of its insured. A breach of this duty will give rise to a cause of action in tort against the insurer." *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272 (1983), paragraph one of the syllabus.

{¶23} [W]henever an insurance company denies a claim of its insured, it will not automatically expose itself to an action in tort. Mere refusal to pay insurance is not, in itself, conclusive of bad faith. But when an insurer insists that it was justified in refusing to pay a claim of its insured because it believed there was no coverage of the claim, 'such a belief may not be an arbitrary or capricious one. The conduct of the insurer must be based on circumstances that furnish reasonable justification therefor.' *Id.* at 277, quoting *Hart v. Republic Mut. Ins. Co.*, 152 Ohio St. 185, 188 (1949); approved and followed by *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552 (1994), paragraph one of the syllabus ("[a]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor").

**{¶24}** As a threshold argument, Fidelity argues appellants have no contractual relationship with the company; thus, it contends, appellants have no basis for a claim of bad faith. Appellants seem to acknowledge that such a claim can only be brought by an insured. However, appellants argue that there *is* a contractual relationship and Ms. Horvath is an insured because closing protection attaches by operation of law when an insurance company cannot produce evidence that the required coverage was offered and rejected. Fidelity also asserts that, even if there is such a relationship, there is no evidence of bad faith that would give rise to such a claim.

**{¶25}** Appellants are correct in asserting that closing or settlement protection is required to be offered. R.C. 3953.32 provides, in relevant part:

**{¶26}** (A) At the time an order is placed with a title insurance company for issuance of a title insurance policy, the title insurance company or the title insurance agent shall offer closing or settlement protection to the lender, borrower, and seller of the property, and to any applicant for title insurance.

**{¶27}** (B) The closing or settlement protection offered pursuant to this section shall indemnify any lender, borrower, seller, and applicant that has requested the protection, both individually and collectively, against the loss of settlement funds resulting from any of the following acts of the title insurance company's named title insurance agent or anyone acting on the agent's behalf:

**{¶28}** (1) Theft, misappropriation, fraud, or any other failure to properly disburse settlement, closing, or escrow funds;

8

**{¶29}** (2) Failure to comply with any applicable written closing instructions, when agreed to by the title insurance agent.

**{¶30}** Here, there is no evidence that suggests Ms. Horvath either was or was not offered closing protection by the title insurance company, Portage Title. Ms. Horvath testified she does not remember if it was offered. Portage Title had closed its operations in December 2009. The obligation to offer the closing protection arises under the statute at the time the "order is placed with a title insurance company for issuance of a title insurance policy." R.C. 3953.32(A). No one is able to say definitively that this was or was not done. In either case, it is undisputed that Ms. Horvath did not purchase the closing coverage and therefore had no such protection.

**{¶31}** Fidelity contends the obligation to offer closing protection does not amount to "insurance." It claims it only creates an indemnification provision. Thus, appellants' claims are dependent, as an initial matter, on the contention that the closing protection is, in fact, insurance, and that the estate is an insured "by operation of law."

**{¶32}** Under appellants' theory, Fidelity bears the burden to demonstrate that closing protection was offered and rejected. They argue the failure to affirmatively demonstrate that the mandatory protection coverage was offered translates into the protection attaching as a matter of law. In support of this theory, appellants point to former R.C. 3937.18, which concerned UM/UIM coverage, and case law interpreting the statute. Under former R.C. 3937.18, however, UM/UIM coverage existed by operation of law *unless the insured* rejected such coverage; the burden of proving that a customer knowingly rejected this coverage was allocated to insurance companies. *See Linko v. Indemnity Ins. Co.*, 90 Ohio St.3d 445, 451. R.C. 3937.18 has since been amended to remove the language that an insured must expressly reject the coverage.

**{¶33}** There is little authority or precedent that interprets the rights and obligations of the parties with regard to this statute. We hold here that the obligation created by R.C. 3953.32 to offer closing protection is a clear directive from the legislature to offer insurance coverage to buyers, sellers, and lenders for the events set forth in section (B)(1) and (2) of the statute. Section (C) specifically states: "The issuance of closing or settlement protection by a title insurance company pursuant to division (A) of this section is part of the business of title insurance for purposes of Chapter 3953 of the Revised Code." The obligation to establish compliance with the statute is on the entity who is obligated to offer the protection. In this case, that entity is Portage Title, the title insurance agent, and/or Fidelity, the title insurance company.

**{¶34}** The issue that remains to be resolved is whether there is sufficient evidentiary material in the record to create a question of fact, which, if construed most favorably to appellants, allows appellants to survive summary judgment. This case centers on appellants' contention that Fidelity should have assessed Ms. Horvath's claim and paid it in a more expedited manner, and that its failure to do so was bad faith. With regard to the claim of bad faith, summary judgment in favor of Fidelity was appropriate.

**{¶35}** As an initial matter, the obligation set forth in R.C. 3953.32 is fairly new. The requirement to offer the coverage "at the time the order is placed" was effective only as of April 6, 2007. The relationship between Portage Title and Fidelity was such that Portage Title agreed to offer the closing protection at the time the order for insurance was placed. Portage Title closed its operation in December 2009, and Fidelity formally cancelled its agency relationship with Portage Title on December 17, 2009. Appellants communicated with a representative of Fidelity in January 2010. It

10

clearly would have taken some time to determine whether Portage Title had, in fact, met its obligation to offer the closing protection coverage. It is not clear how much cooperation any of the parties were getting from the defunct company. However, it seems the foundation of any claim against Fidelity is premised upon this obligation to offer closing protection.

{¶36} In addition to the problems associated with what actually occurred at the time the obligation to offer the protection arose, it cannot be concluded that Fidelity had clear authority that unequivocally resolved its duties and obligations in the event closing protection was not properly offered. It would therefore be difficult to characterize the delay arising from Fidelity's attempts to resolve the issue as bad faith.

{¶37} Ms. Horvath testified that she considered Fidelity to have acted in bad faith around February 2010 when her calls from Fidelity were no longer being returned. There is a multitude of documents and claims concerning when correspondence was initiated or when calls were placed, much of which is not of the evidentiary quality required by Civ.R. 56(C). However, the record indicates Ms. Horvath retained legal counsel who initiated contact with Fidelity. Evidence demonstrates Fidelity was in contact with Ms. Horvath's attorney in February 2010. Ms. Horvath, unaware of her counsel's efforts, continued to make attempts to contact various Fidelity agents, including Claims Counsel Mark Mendenhall. Ms. Horvath's deposition testimony indicates she did not know Fidelity had already communicated with her attorney but instead felt marginalized by the erroneous belief that her calls were being avoided. Ms. Horvath also explained during her deposition that she did not think it relevant to call her counsel for regular updates due to legal costs. Further, there is evidence that illustrates Fidelity did not treat Ms. Horvath as an insured attempting to collect a claim because

11

she did not have any coverage; Ms. Horvath's efforts were instead treated as mere inquiries. The confusion over Ms. Horvath's status, as well as the nature of her grievances and the specifics of the problem, are not indicative of bad faith.

{¶38} As Fidelity met its evidentiary burden by referring to deposition testimony and other evidentiary materials which established the above-framed points, appellants had the reciprocal burden to point to evidentiary material that suggested summary judgment was not warranted. In their opposition motion, appellants attached an affidavit from Ms. Horvath's former attorney who, in fact, averred she had contact with Fidelity Claims Counsel Mark Mendenhall in February 2010. She explained, however, that she was unable to contact an agent of Lawyers Title. These materials fail to establish a genuine issue of material fact.

{¶39} Ultimately, we cannot determine the trial court erred as a matter of law in entering summary judgment in favor of Fidelity on Count Two of the amended complaint. The evidentiary materials in the record demonstrate that summary judgment is indeed warranted as Fidelity's alleged inaction, which formed the basis of the claim, does not rise to the level of bad faith; in fact, there is no evidence in the record that supports a finding of bad faith.

{¶40} On Count Three, appellants alleged that Fidelity negligently selected, supervised, trained or retained its agent, Portage Title, and is liable for its actions, which include theft and conversion. They further allege that Fidelity had actual knowledge that its agent was acting in a manner where a reasonable person would have anticipated an injury likely to result, characterizing the operation as "a train wreck waiting to happen." In support, appellants point to a March 2008 "quality assurance review" of Portage Title which revealed that "more often than not" closing protection was not being offered, and

12

additionally, three-way reconciliations of accounts were not being performed. The review was conducted by LandAmerica, the holding company that owned Lawyers Title at the time.

{¶41} The existence of an agency relationship between Lawyers Title and Portage Title is not in dispute. Lawyers Title was subsequently acquired by Fidelity and the agency relationship continued until Fidelity retroactively ended the agreement effective November 25, 2009, via letter to Portage Title dated December 17, 2009.

{¶42} Rather, Fidelity maintains it is not liable for the actions of Portage Title as the alleged acts fall well outside the scope of the parties' agency agreement. Indeed, a review of the agency agreement reveals that the scope of the agency did not include the handling of funds or escrow functions but, instead, conferred authority upon the agent "limited to the issuance of insurance commitments, policies and endorsements and the collection of premiums as set forth herein." In this case, the handling of funds from an escrow account is outside the scope of the relationship and the agent's authority such that Fidelity, as the principle and title underwriter, cannot be held liable. *See generally Finley v. Schuett*, 8 Ohio App.3d 38, 39 (1st Dist.1982) ("a principal shall be liable for the tortious acts of his agent only when such acts were done in the execution of his principal's business and within the scope of the agent's employment"). The parties' agency agreement therefore expressly limits the nature and scope of the relationship such that Fidelity cannot be held liable for Portage Title's participation in its closings or escrow services.

{¶43} Appellants assert that Ms. Horvath, as an insured and as executor of the Estate, fell within the class of persons whose closing *was* within the scope of the agency agreement. As stated above, the record establishes, and it is important to

13

recognize, that the services provided by Portage Title were broader than the scope of the Agency Agreement between Portage Title and Fidelity. Portage Title was a separate legal entity that provided title insurance services to Fidelity. However, Portage Title also provided escrow services to customers that were not included in the scope of the Agency Agreement. There is nothing in the record to suggest Fidelity received any benefit from the provision of these services by Portage Title. Knowledge of the audit history of Portage Title's escrow account does not, by itself, give rise to liability of the company for whom such title company sells insurance under an Agency Agreement.

{¶44} The trial court did not err in entering summary judgment in favor of Fidelity as a matter of law on Count Three of the amended complaint.

{¶45} Accordingly, appellants' first and second assignments of error are without merit.

{¶46} The judgment of the Portage County Court of Common Pleas is affirmed.


CYNTHIA WESTCOTT RICE, J.,

THOMAS R. WRIGHT, J.,

concur.